**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 22, 2020

**BY ECF**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

     Re:    *United States* v. *Martins Apskalns*, S9 16 Cr. 692 (JMF)

Dear Judge Furman:

     The defendant in this case, Martins Apskalns ("Apskalns" or the "defendant"), is scheduled to be sentenced on January 29, 2020, having pleaded guilty to conspiracy to commit bank fraud and wire fraud. The Government respectfully submits this letter in advance of the sentencing. In a plea agreement between the parties, the Government and the defendant stipulated to a United States Sentencing Guidelines ("Guidelines") range of 87 to 108 months' imprisonment.

     Apskalns is the most culpable defendant charged to date in this twenty-defendant fraud case. Beginning in approximately January 2016, Apskalns participated in the fraud scheme directly in the United States, and after he returned to Latvia through the time of his arrest in November 2018, Apskalns managed from abroad other co-conspirators who were actively engaging in the scheme in the United States. Indeed, Apskalns is responsible for more than $4.9 million in victim loss—a figure that accounts for victim funds that were deposited into bank accounts controlled by Apskalns directly, as well as into the accounts controlled by co-conspirators whom Apskalns directed. For that reason, among others elaborated in greater detail below, the Government submits that a sentence within the Guidelines Range would be sufficient but not greater than necessary to serve the purposes of sentencing.

    A. **Offense Conduct**

        *1. The Fraud Scheme*

     As the Court is aware, this case involves a wire fraud and money laundering conspiracy operated by a network of individuals located in the United States and overseas. The conspiracy has targeted victims principally through variations on an internet fraud: a member of the conspiracy posts an advertisement for a car, boat, tractor, kitchen appliance, or other singular, expensive, and fungible property for sale on the internet. *See* U.S. Probation Office's Final Presentence Report, dated December 17, 2019 ("PSR") ¶ 13. These advertisements are typically posted on well-known websites involving either auctions or direct sales, such as eBay or Craigslist.

*Id.* Though posted on sites where unaffiliated sellers can attempt transactions, the conspiracy often fraudulently utilizes the names, logos, and business pedigree of legitimate businesses to give the veneer of credibility to the ads, and take advantage of positive reviews attributed to the true businesses. *Id.*

After a prospective victim makes an inquiry in response to an advertisement, the members of the conspiracy controlling the fake ads negotiate with the buyers, typically via e-mail. *Id.* ¶ 14. Again, the e-mail addresses mimic or duplicate those of the legitimate businesses. *Id.* The conspirators and victims come to an agreement, at which point, the conspirators provide wiring instructions to the victims. *Id.* Maintaining the illusion of legitimacy, conspirators suggest an arms-length transaction by directing victims to third-party bank accounts, which are either corporate or business accounts. *Id.* Those accounts are opened at the banks in the names of shell corporations established for the purpose of furthering the fraud. *Id.* Once recruited by the conspiracy, members responsible for the bank accounts are named as the principals of the shell corporations, and in turn open accounts at multiple banks to await transfer of victim funds as directed by the co-conspirators controlling the online advertisements. *Id.* ¶¶ 14, 15.

Victims then wire funds into the shell corporation bank accounts, believing they are transmitting funds in order to, for example, purchase a vehicle and pay for its transportation. *Id.* ¶¶ 14, 15. Next, conspirators who have established the accounts are alerted to the money transfers by other members of the scheme. The same or next day of the transfer, members of the scheme controlling the accounts head to the banks and begin withdrawing funds. *Id.* ¶ 15. The withdrawals are made in cash, from both ATMs and the tellers at bank counters. *Id.*

During this short period, victims are unaware that their funds are being drained, and the overriding goal of the conspirators is to take all the money before the funds can be frozen and otherwise stopped. To accomplish this, conspirators will withdraw funds from numerous bank branches in rapid succession, frequently on the same day. After funds are withdrawn, money is then distributed among the conspiracy in various ways, including via wiring or physical transportation, principally from within the United States back to Europe. *Id.* Victims do not ever receive the items they believed they were purchasing, and are generally unable to recoup their funds once the money has been withdrawn from the accounts. *Id.*

2.  *The Defendant's Conduct*

Apskalns was a member of the conspiracy who opened bank accounts, withdrew victim funds, managed the accounts and activities of co-conspirators, and facilitated the laundering of victim funds to the overseas leadership of the fraud scheme.

Apskalns entered the United States on January 12, 2016, and two days after his arrival, "Kasis Corporation" was incorporated on January 14, 2016 using Apskalns's name. Soon thereafter, Apskalns opened business or corporate bank accounts at three banks in Kasis Corp.'s name. The Kasis Corp. bank accounts received victim funds, and Apskalns withdrew the funds from ATMs or at counter withdrawals, typically in amounts under $10,000, until the victim's transfer had been entirely or almost entirely cashed out of the Kasis accounts. Apskalns sent a portion of the funds via Western Union or MoneyGram to recipients in Europe, as directed by

scheme managers, and he also dropped cash off from his withdrawals, as well as withdrawals of his co-conspirators, to an individual in Brooklyn, New York. In total, the three Kasis accounts received $109,850 in victim funds from February 2016 through June 2016, and Apskalns successfully withdrew almost $100,000 in cash.

Apskalns returned to the United States in January 2017 and stayed in the Miami, Florida area until February 2017, where he lived in a house with some of the same co-conspirators whom he worked with in New York. During this time in the United States, Apskalns did not open any bank accounts, but as instructed by a co-conspirator, Apskalns picked up cash in the U.S. and dropped it off to an individual in Latvia upon his return to Europe.

Until his arrest in Latvia on November 28, 2018, Apskalns acted as a manager of the fraud scheme. Specifically, he alerted co-conspirators in the United States when victims would be transferring funds into bank accounts controlled by the conspiracy, passed along specifics from the victim's wire transfer to assist in answering any questions from bank employees, and provided directions as to how and when to withdraw victim funds from the accounts. Apskalns also instructed co-conspirators what to do with the cash after it was withdrawn, either by providing a recipient and amount for a Western Union and/or MoneyGram transfer or by facilitating a bitcoin transaction. At the time of his arrest in Latvia, Apskalns was directing the fraudulent activities of Valters Volksons, Janis Berns, Raitis Grigorjevs, and Agris Petrovs in the United States.

### 3. *The Status of Co-Defendants' Cases*

Twenty co-conspirators have been charged in the case pending before this Court to date, and fourteen have been sentenced by Your Honor. *Id.* ¶ 6. Apskalns is significantly more culpable than any other individual charged in the scheme to date, although he is most similar to other individuals who acted in a supervisory capacity as "handlers" in the U.S. like Janis Klava (sentenced to 66 months), Kristaps Beresnevics (sentenced to 66 months), and Emils Mors (sentenced to 57 months).

Apskalns was involved in the fraud scheme for nearly three years—first as a lower level member of the scheme who opened bank accounts and withdrew cash in the United States, but thereafter as a manager who directed the fraudulent activities of other co-conspirators from abroad. By contrast to Klava, Beresnevics, and Mors—individuals who supervised mules on the ground in the United States—Apskalns was an even more senior member of the conspiracy, who resided in Latvia and directed activities on the ground in the United States from afar. Indeed, Klava, Beresnevics, and Mors received their instructions and information from an individual like Apskalns, who provided details on the specifics of the victim wire transfers (the victim's name, amount, what the victim allegedly purchased, and the account receiving the transfer), as well as the method (money transfer service or bitcoin) and recipient to transfer the the cash withdrawn from accounts controlled by co-conspirators.

Considering his own victims, as well as the victim loss for the individuals whom he managed, Apskalns is responsible for nearly $5 million in loss, which is several orders of magnitude greater than the loss attributable to any other defendant charged in this scheme.

Case 1:16-cr-00692-JMF   Document 428   Filed 01/22/20   Page 4 of 7

Page 4

**B. The Plea and Guidelines Calculation**

On September 25, 2019, pursuant to a plea agreement, Apskalns pleaded guilty to conspiracy to commit bank and wire fraud, as charged in Count One of the Superseding Indictment. PSR ¶ 5. In the plea agreement, the parties stipulated to a Sentencing Guidelines offense level of 29 and a criminal history category of I,[1] resulting in a Guidelines range of 87 to 108 months' imprisonment. *Id.* The Guidelines calculation in the PSR is in accord with the stipulated Guidelines range in the plea agreement. *Id.* ¶¶ 32-47.

**C. Discussion**

*1. Applicable Law*

As the court is aware, the Guidelines still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

---

[1] Although Apskalns has no prior criminal history in the United States, he does have two foreign convictions of which the Government is currently aware. On May 29, 2012, Apskalns was charged with 14 counts of fraud and money laundering in the Bailiwick of Guernsey related to a scheme involving the fraudulent use of stolen credit cards to purchase airline flights and mobile phone top ups and subsequently the laundering of the fraud proceeds through Guernsey-based bank accounts. PSR ¶ 48. On March 1, 2013, Apskalns was convicted of the offenses and sentenced to four years' imprisonment; Apskalns was later deported to Latvia on September 11, 2014. *Id.* Madars Jankevics, a co-defendant in this matter, was alleged to be involved in the scheme with Apskalns in Guernsey but absconded prior to trial. *Id.* Apskalns also has a previous conviction in Guernsey for importing 800 steroid tablets for which he pleaded guilty and was sentenced to four months' imprisonment. *Id.* ¶ 49.

      (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
      (B)    to afford adequate deterrence to criminal conduct;
      (C)    to protect the public from further crimes of the defendant; and
      (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

    *2. A Guidelines Sentence Is Reasonable in This Case*

The Government respectfully submits that a sentence within the Guidelines range to which the parties stipulated of 87 to 108 months' imprisonment is sufficient, but not greater than necessary, to comply with the purposes of sentencing. Weighing the applicable factors under 18 U.S.C. § 3553(a)(2), it is clear that the seriousness of the offense, and the need to promote respect for the law, provide just punishment, afford adequate deterrence and protect the public, are all significant considerations in crafting a just sentence given the conduct at issue in this case.

*First*, a Guidelines sentence is necessary to reflect the seriousness of the defendant's conduct, to promote respect for the law, and to provide just punishment. The conspiracy outlined herein resulted in millions of dollars in losses to consumers. As this Court is aware and has previously acknowledged while sentencing co-conspirators, the victims of the conspiracy have by and large been everyday Americans. As reflected in victim impact statements, many victims devoted considerable savings and emotional investment to their intended purchases—frequently classic cars or farm equipment or machinery.[2] Many of the victims have reported saving funds and waiting for the right opportunity, and nearly all describe their surprise, and the emotional toll, of being taken by a complex scam. The conspirators went to impressive lengths; far from a random, mass email conceit that would take a substantial share of unsophisticated victims, the

---

[2] Redacted victim impact statements are available on the 16 Cr. 692 docket at ECF Nos. 82, 94, 244, 245, 253, and 330. The statements below are from victims (identified by initials) whose funds were deposited into accounts opened and controlled by Apskalns:

- ECF No. 245 at 3-5 (J.P.N.); *id.* at 23 (P.E.).

The following statements are from victims (identified by initials) who sent money to accounts in the names of co-conspirators managed by Apskalns:

- ECF No. 245 at 2 (J.J.); *id.* at 12-16 (E.H.); *id.* at 17-18 (K.S.)*; id.* at 19-20 (M.S.); *id.* at 21 (L.H.); *id.* at 24 (S.B.); *id.* at 25-28 (M.F. and L.F.); *id.* at 29-30 (R.F.); *id.* at 33-47 (R.S.).
- ECF No. 253 at 3-7 (J.P.); *id.* at 8-9 (W.P.); *id.* at 10-11 (S.J.); *id.* at 12-13 (M.H.); *id.* at 14-16 (J.M.); *id.* at 17-18 (J.M.).
- ECF No. 330 at 52-57 (C.S.); *id.* at 59 (D.Z.); *id.* at 60-61 (D.O. and S.L.O.); *id.* at 62 (D.M.); *id.* at 64 (D.E.); *id.* at 65 (G.D. and D.D.); *id.* at 66 (J.D.).
- ECF No. 427 at 2 (M.S.); *id.* at 3-14 (B.T.).

conspirators posted ads using real business identities, took pains to provide photographs, VIN numbers, registration information, insurance history, and detailed records about the cars in an effort to prove their authenticity and *bona fides* as dealers.

Even the defendant's initial role in the case—opening bank accounts and withdrawing victim funds—was critical. By impersonating a shell corporation and opening corporate banking accounts, the defendant played a crucial part in convincing even careful victims to part with tens of thousands of dollars. Believing they were sending their money to a business—with all the legitimacy and protection that sense conveyed—the victims did not suspect their money was vanishing without any real possibility of recourse. Simply put, the fraud cannot be completed without front-line participants.

Moreover, the defendant's culpability is far greater than the typical low-level participants in the scheme, given that Apskalns had a pronounced and extended role in managing and advancing the fraud scheme from Europe. Indeed, in addition to several unindicted co-conspirators, Apskalns was responsible for managing at least seven defendants that this Court has already sentenced—Janis Berns, Raitis Grigorjevs, Madars Jankevics, Ivars Ozols, Agris Petrovs, Toms Saulgriezis, and Valters Volksons.

Thus, a Guidelines Sentence is necessary and appropriate to respond to the nature and seriousness of the offense and the defendant's proportionately far more culpable role in the scheme, as compared to many already sentenced codefendants

*Second*, a sentence within the stipulated Guidelines range is significant, and is necessary to afford adequate deterrence to both the defendant as well as others similarly situated. The Government submits that the Court may consider Apskalns's 2013 conviction in Guernsey on fraud and money laundering charges in evaluating this factor. Apskalns's Guernsey conviction illustrates that the instant offense is not the first time that Apskalns has traveled abroad to defraud victims and launder the proceeds of the scheme. Moreover, in this case, Apskalns participated in the fraud scheme for nearly three years—up until the day of his arrest in Kuldiga, Latvia on November 28, 2018. At that time, Apskalns was actively managing four individuals in the United States who were opening bank accounts and withdrawing victim funds. Apskalns communicated with the "handler" of these four co-conspirators multiple times per day to provide details on incoming victim transfers and sending cash back to Europe, and to receive updates from the handler regarding the success of the mules at withdrawing victim funds. Indeed, Apskalns's last message to the U.S. handler was sent only hours before his arrest in this case.

General deterrence is likewise a critical concern. As is evidenced by the size of this case, the amount of loss to victims, and the number of victims, the crimes committed by the defendant are both incredibly serious and all too common. A sentence within the Guidelines range will help send a message to other individuals that taking part in such activity is not a risk-free enterprise.

*Finally*, a Guidelines sentence is also necessary to protect the public from the defendant's future crimes. Apskalns was fully aware of the nature and scope of the fraud. He nevertheless continued to participate and to deepen his involvement over three years. The victim statements demonstrate that most victims—many of whom are retired and living on fixed incomes—

experienced significant and devastating financial loss, as well as a profound emotional toll from feeling duped by the fraud scheme.  By contrast, Apskalns had a callous disregard for his victims, focusing only on his own greed.  Apskalns's own words, written to the handler of Berns, Grigorjevs, Petrovs, and Volksons on November 10, 2018, perfectly illustrate his state of mind with respect to the fraud scheme:  "You can't get rich with your own money."

The stipulated Guidelines range accounts for the defendant's participation in the fraudulent scheme for nearly three years and the seriousness of the impact on the victims of the conspiracy. A Guidelines sentence between 87 and 108 months is therefore appropriate.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

by: _____
Emily A. Johnson
Matthew J.C. Hellman
Daniel G. Nessim
Assistant United States Attorneys
(212) 637-2409 / -2278 / -2486

cc: Eric Franz, Esq. (by ECF and email)
Christopher Wright, Esq. (by ECF and email)